UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
_____
                              )
DAVID M. GOLDEN, et. al.,     )
Plaintiffs                    )
                              )
v.                            )   CIVIL ACTION NO: 04-10835
                              )
COUNTY OF SUFFOLK,            )
Defendant                     )
_____)
```

## DEFENDANT'S STATEMENT OF UNDISPUTED FACTS

Now comes Defendant, Suffolk County, pursuant to Local Rule 56.1 and submits the following undisputed facts in support of its Motion for Summary Judgment.

1. The Suffolk County Sheriff's Department ("Department"/"SCSD") is a division of Suffolk County. The Sheriff's Department operates two correctional facilities, the Nashua Street Jail ("NSJ") which houses pre-trial detainees and the Suffolk County House of Correction ("HOC") which houses sentenced individuals. Each facility has a distinct Superintendent who is responsible for its daily operation, including supervision of staff. Affidavit Gerard Horgan (hereinafter "Horgan Affidavit"), Exhibit A.

2. Gerard Horgan is the Superintendent of the Suffolk County House of Correction ("HOC"). He has held that position since November 2003. Horgan replaced Patrick Bradley who was Superintendent from November 2002 to November 2003. The Superintendent is responsible for the daily operation of the HOC. Horgan Affidavit, Exhibit A.

3. Andrea Cabral is the current Sheriff of Suffolk County having assumed office in November 2002. Horgan Affidavit, Exhibit A.

4. From 1996 to November 2002, Richard J. Rouse was the Sheriff of Suffolk County. Horgan Affidavit, Exhibit A.

5. M.G.L. c. 126 §16 delegates the authority for the custody and control of the jail and House of Correction, in Suffolk County, and its inmates to the Sheriff. M.G.L. c. 126 §16.

6. M.G.L. c. 126 §16 provides for the discretionary authority of the Sheriff and prison officials of housing inmates within its facilities. M.G.L. c. 126 §16.

7. 105 CMR 451.321 is not a mandatory standard but rather a recommended standard pursuant to 105 CMR 451.012. 105 CMR 451.012

8. 105 CMR 451.012 provides that: "Recommended Standards (.300 Series) In addition, in order to provide physical living conditions adequate to maintain the health and safety of inmates of correctional facilities, the Department, pursuant to M.G.L. c. 111, § 5, recommends that each correctional facility comply with the *Recommended Minimum Health and Sanitation Standards* set forth in 105 CMR 451.320 through 105 CMR 451.390 (.300 Series)." 105 CMR 451.012.

9. 105 CMR 451.012 provides for the discretion of prison officials in housing inmates within cells within its institution. 105 CMR 451.012.

10. Prison officials are not required to comply with recommended standards of the Code of Massachusetts Regulations. Horgan Affidavit, Exhibit A.

11. John Connolly was an inmate committed to the Suffolk County House of Correction on February 3, 2003. John Connolly Deposition, pp. 30-31 (hereinafter Connolly Deposition) Exhibit C.

12. From July 1, 2002 to February 4, 2003, Plaintiff was housed in the 4-3 Unit, Cell #19. Connolly Deposition, p. 39, Exhibit C; Horgan Affidavit, Exhibit A.

13. Plaintiff knew how to get in contact with his caseworker and he knew how to make complaints relating to housing concerns. Connolly Deposition, pp. 37-38, Exhibit C.

14. Plaintiff had been incarcerated at various State and County Correctional facilities since 1981. Connolly Deposition, p. 17, Exhibit C.

15. Prior to February 3, 2003, Plaintiff had been incarcerated at the Suffolk County House of Correction from 1995-1998, 1998–1999, 1999-2001 and 2001-2005. In 2003, Plaintiff was released from custody for a brief period of time. Connolly Deposition pp. 17 and 30-31, Exhibit C.

16. Prior to 1995, Plaintiff had been incarcerated in 1981 at the Suffolk County HOC at Deer Island, 1982-1985 at MCI Concord, 1987-1988 at the Norfolk House of Correction and 1991-1992 at the Suffolk County HOC. Connolly Deposition pp. 17 and 20, Exhibit C.

17. In addition to the Suffolk County HOC, Plaintiff had been incarcerated at the Norfolk County House of Correction, Barnstable County House of Correction, Massachusetts Correctional Institution ("MCI") at Concord and MCI Bridgewater. Connolly Deposition, pp. 170-174, Exhibit C.

18. Norfolk County House of Correction, Barnstable County House of Correction, MCI Concord and Bridgewater did not have ladders attached to the bunk beds. Connolly Deposition, pp. 170-174, Exhibit C. At these facilities, Plaintiff would utilize the frame of the lower bunk or stack lockers to ascend to and descend from the top bunk. Connolly Deposition, pp. 170-174, Exhibit C.

19. Despite having been housed in correctional facilities for more than twenty (20) years, <u>none of which had bunk beds equipped with ladders</u>, Plaintiff never fell while ascending to or descending from his bunk bed. Connolly Deposition, pp. 170-174, Exhibit C.

20. Plaintiff never made any complaints to officials at any of the correctional facilities that he was housed that the lack of ladders made it unsafe or dangerous to ascend to or descend from the top bunk. Connolly Deposition, pp. 170-174, Exhibit C.

21. Prior to February 3, 2003, at the Suffolk County HOC, Plaintiff never made any complaints to officials that the lack of ladders made it unsafe or dangerous to ascend to or descend from the top bunk. Connolly Deposition, pp. 174-175, Exhibit C.

22. Prior to February 3, 2003, at the Suffolk County HOC, Plaintiff never filed a grievance that the lack of ladders made it unsafe or dangerous to ascend to or descend from the top bunk. Connolly Deposition, p. 52, Exhibit C.

23. Plaintiff never wrote to any official(s) of the Suffolk County Sheriff's Department complaining that lack of ladders made it unsafe or dangerous to ascend to or descend from the top bunk. Connolly Deposition, p. 174, Exhibit C.

24. While at the Suffolk County HOC, Plaintiff would ascend to and descend from his bunk bed between six (6) and nine (9) times per day. Connolly Deposition, p. 55, Exhibit C.

25. Plaintiff used a chair in order to ascend to and descend from his top bunk. Connolly Deposition, p. 56, Exhibit C.

26. Between 2000 and 2003, there were three (3) inmate grievances filed at the HOC relating to bunk beds. One from August 2000, a request to have

3

        a cast removed claiming inmate had fallen while coming down from the bunk; another from January 2001, a request to have a bottom bunk due to a medical issue of issue with weight; and a third from January 2001, a request for a bottom bunk due to medical issue with cyst on leg and a claim that there was no ladder to or from the bunk bed. Horgan Affidavit, Exhibit A.

27. In 2002, there were seven (7) reported incidents of alleged falls from bunkbeds at the HOC. One of those reported seven (7) incidents at the HOC in 2002 was found to be false with the inmate having lied about falling out of her bunk bed as initially complained. Thus, there were only six (6) reported alleged incidents of falls while ascending or descending bunk beds at the HOC in 2002. Horgan Affidavit, Exhibit A.

28. One of the seven (7) reported incidents from 2002 involved an inmate, Thomas Crosby, one of the six original plaintiffs, who was on a Q5, suicide watch status. Horgan Deposition p. 59, Exhibit B. Mr. Crosby had a suicide attempt by hanging while in police custody. Horgan Affidavit, Exhibit A.

29. These six reports in 2002 of alleged falls by inmates do not contain any specific information regarding the circumstances or nature of the fall or set forth the extent of any alleged injury sustained. It is unclear from these daily reports how or if any of the inmates fell while ascending or descending their bunks. Most of the reports contain conflicting versions of how the inmates allegedly fell or were injured. Horgan Affidavit, Exhibit A.

30. In 2002, the average daily population at the HOC was between 1500 and 1900 inmates. Horgan Affidavit, Exhibit A; Horgan Deposition p. 33. In 2002, there were a total of 17,515 inmates who came in and out of the HOC and NSJ over the course of that year. Horgan Affidavit, Exhibit A.

31. In 2002 at the HOC, on a daily basis, approximately 1/3 of the 1500-1900 inmates would ascend and descend to and from their bunks approximately six (6) times per day. In 2002, inmates ascended and descended the top bunk over **1,277,500 times per year**.[1] Horgan Affidavit, Exhibit A.

32. In 2003, there was one (1) alleged fall at the HOC involving one of the original six plaintiffs and one (1) alleged fall while ascending to and descending from a bunk bed at the NSJ also involving one of the original six plaintiffs. Horgan Affidavit, Exhibit A.

---

[1] This calculation was reached as follows: 1750 inmates (difference between 1500 and 1900 inmates which was the average daily population) / 3 (only 1/3 of that population resided on the top bunk) x 365 (days per year) x 6 (number of times up and down per day) = 1,277,500.

4

33. In 2003, there were 19,109 inmates who came in and out of the HOC and NSJ over the course of that year. Horgan Affidavit, Exhibit A.

34. In 2000, there was one (1) alleged fall at the HOC and one (1) alleged fall in 2000 at the NSJ. The inmate who allegedly fell while ascending to and descending from a bunk bed at the HOC, also filed a grievance after he fell requesting to have his cast removed. Horgan Affidavit, Exhibit A.

35. In 2000, there were 16,078 inmates who came in and out of the HOC and NSJ over the course of that year. Horgan Affidavit, Exhibit A.

36. In 1999, there was one (1) alleged fall while ascending to and descending from a bunk bed at the NSJ. Horgan Affidavit, Exhibit A.

37. In 1999, there were 15,710 inmates who came in and out of the HOC and NSJ over the course of that year. Horgan Affidavit, Exhibit A.

38. From 1999 to 2003, there were <u>85,408 inmates</u> who came in and out of the NSJ and HOC. Horgan Affidavit, Exhibit A.

39. Over a five (5) year period, from 1999 to 2003, there were a total of eleven (11) reported incidents of inmates allegedly falling while ascending to or descending from bunks at both the NSJ and HOC. Horgan Affidavit, Exhibit A.

40. In the early 2000s, prior to this incident, prison officials considered whether to install ladders on bunk beds. Ladders on bunk beds posed a potential danger to the health and safety of inmates because they posed a significant suicide risk by hanging or choking and could be used as weapons by dismantling the ladders or using them during an altercation to choke or otherwise assault another inmate, among others. Inmates could also easily be hurt by falling while ascending or descending to their bunks. Ladders were not installed. Affidavit Horgan, Exhibit A and Horgan Deposition, pp. 29-31.

41. The Department of Correction ("DOC") audited the HOC and NSJ two times per year pursuant to the M.G.L. c. 127 §1B. M.G.L. c. 127 §1B; Horgan Affidavit, Exhibit A; Horgan Deposition, pp. 24-25, Exhibit B.

42. The DOC inspections never noted any defect, hazard or violation of the Department for not equipping bunk beds with ladders. Horgan Affidavit, Exhibit A; Horgan Deposition, pp. 24-25, Exhibit B.

43. Suffolk County had self-imposed measures to notify officials of potential concerns within the NSJ and HOC in addition to the DOC audits. Prior to February 2003, the inmate grievance coordinator reviewed grievances for

5

potential issues; the Health Services Administrator, an independent contractor, reviewed medical records to evaluate what types of injuries inmates were sustaining while incarcerated at the HOC; Department personnel reviewed daily records, incident reports, Sheriff's Emergency Response Team (SERT) records and logbook records for potential issues, inmate discipline, employee discipline, medical issues and inmate injuries; and staff meetings with captains, lieutenants, and sergeants were held during which institutional issues were discussed.  None of these reviews or meetings identified any concern relative to inmates being injured while ascending to or descending from bunk beds.  Horgan Deposition, pp. 31, 36, Exhibit B; Horgan Affidavit, Exhibit A.

>Respectfully submitted,
>Attorney for Defendant, Suffolk County,
>By its attorney,
>
>/s/ Alison G. Fabella_____
>Alison G. Fabella, BBO # 654858
>Assistant General Counsel
>Suffolk County Sheriff's Department
>200 Nashua Street
>Boston, MA  02114
>(617) 961-6678

Dated: November 9, 2007