UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| DAVID M. GOLDEN, et. al., | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO: 04-10835 |
| | ) | |
| COUNTY OF SUFFOLK, | ) | |
| Defendant | ) | |

## AFFIDAVIT OF GERARD J. HORGAN

I, Gerard J. Horgan, being duly sworn do hereby depose and state:

1. My name is Gerard J. Horgan. I have worked for the Suffolk County Sheriff's Department since 1987. I have held various positions during my tenure.

2. I am currently the Special Sheriff and the Superintendent of the Suffolk County House of Correction and have held this position since November 2003. I replaced Patrick Bradley who was Superintendent from November 2002 to November 2003. As Superintendent I am responsible for the daily operation of the HOC.

3. The Suffolk County Sheriff's Department ("Department"/"SCSD") is a division of Suffolk County. The Sheriff's Department operates two correctional facilities, the Nashua Street Jail ("NSJ") which houses male pre-trial detainees and the Suffolk County House of Correction ("HOC") which houses sentenced individuals, female pre-trial detainees and overflow male pre-trial detainees from the NSJ. Each facility has a distinct Superintendent who is responsible for its daily operation, including supervision of staff.

4. Andrea Cabral is the current Sheriff of Suffolk County having assumed office in November 2002.

5. From October 1996 to November 2002, Richard J. Rouse was the Sheriff of Suffolk County.

6. Prison officials are not required to comply with recommended standards of the Code of Massachusetts Regulations.

7. From July 1, 2002 to February 4, 2003, John Connolly was housed in the 4-3 Unit, Cell #19.

8. I requested that a search be conducted for all grievances filed by inmates at the HOC from 2000 to 2003 relating to bunk beds and inmates ascending to and descending from said bunk beds.

9. The results are as follows: between 2000 and 2003, three (3) inmate grievances were filed at the HOC relating to bunk beds. One from August 2000, a request to have a cast removed claiming inmate had fallen while coming down from the bunk; another from January 2001, a request to have a bottom bunk due to a medical issue of issue with weight; and a third from January 2001, a request for a bottom bunk due to medical issue with cyst on leg and a claim that there was no ladder to or from the bunk bed.

10. I have reviewed the records of the alleged falls that occurred while inmates were ascending to or descending from their bunk beds. They are as follows:

    a. In 2002, there were seven (7) reported incidents at the HOC.

    b. One of those reported seven (7) incidents at the HOC in 2002 was found to be false with the inmate having lied about falling out of her bunk bed as initially complained. Thus, there were only six (6) reported alleged incidents of falls while ascending or descending bunk beds at the HOC in 2002.

    c. One of the seven (7) reported incidents from 2002 involved an inmate, Thomas Crosby, one of the six original plaintiffs, who was on a Q5, suicide watch status. Mr. Crosby had a suicide attempt by hanging while in police custody.

    d. These six reports in 2002 of alleged falls by inmates do not contain any specific information regarding the circumstances or nature of the fall or set forth the extent of any alleged injury sustained. It is unclear from these daily reports how or if any of the inmates fell while ascending or descending their bunks. Most of the reports contain conflicting versions of how the inmates allegedly fell or were injured.

    e. In 2003, there was one (1) alleged fall at the HOC involving one of the original six plaintiffs and one (1) alleged fall while ascending to and descending from a bunk bed at the NSJ also involving one of the original six plaintiffs.

    f. In 2000, there was one (1) alleged fall at the HOC and one (1) in 2000 at the NSJ. The inmate who allegedly fell while

      ascending to and descending from a bunk bed at the HOC, also filed a grievance after he fell requesting to have his cast removed.

    g. In 1999, there was one (1) alleged fall while ascending to and descending from a bunk bed at the NSJ.

11. Over five (5) years, from 1999 to 2003, there were a total of eleven (11) reported incidents of inmates allegedly falling while ascending to or descending from bunks at both the NSJ and HOC.

12. I have reviewed the data on the number of inmates who have come in and out of the Nashua Street Jail and the House of Correction from 1999 to 2003.

13. In 2002, the average daily population at the HOC was between 1500 and 1900 inmates. In 2002, there were a total of 17,515 inmates who came in and out of the HOC and NSJ over the course of that year.

14. In 2002 at the HOC, on a daily basis, approximately 1/3 of the 1500-1900 inmates would ascend and descend to and from their bunks approximately six (6) times per day. In 2002, inmates ascended and descended the top bunk over **1,277,500 times per year**. This calculation was reached as follows: 1750 inmates (difference between 1500 and 1900 inmates which was the average daily population) / 3 (only 1/3 of that population resided on the top bunk) x 365 (days per year) x 6 (number of times up and down per day) = 1,277,500.

15. In 2003, there were 19,109 inmates who came in and out of the HOC and NSJ over the course of that year.

16. In 2000, there were 16,078 inmates who came in and out of the HOC and NSJ over the course of that year.

17. In 1999, there were 15,710 inmates who came in and out of the HOC and NSJ over the course of that year.

18. From 1999 to 2003, there were <u>85,408 inmates</u> who came in and out of the NSJ and HOC.

19. In the early 2000s, prior to this incident, I was part of a meeting in which prison officials considered whether to install ladders on bunk beds. Ladders on bunk beds posed a potential danger to the health and safety of inmates because they posed a significant suicide risk by hanging or choking and could be used as weapons by dismantling the ladders or using them during an altercation to choke or otherwise assault another inmate, among others. Inmates could also easily be hurt by falling from the ladders while ascending to or descending from

    their bunks. Ladders were not installed. Thomas Crosby, an inmate who previously attempted suicide by hanging is demonstrative of the dangers that ladders posed. Crosby is one of the individuals who allegedly fell in 2002 at the HOC.

20. The Department of Correction ("DOC") audited the HOC and NSJ two times per year pursuant to the M.G.L. c. 127 §1B.

21. The DOC inspections never noted any defect, hazard or violation of the Department for not equipping bunk beds with ladders.

22. In addition to the DOC audits, the Department took steps to identify any areas of potential concern at the NSJ and the HOC. Prior to February 2003, the inmate grievance coordinator reviewed grievances for potential issues; the Health Services Administrator, an independent contractor, reviewed medical records to evaluate what types of injuries inmates were sustaining while incarcerated at the HOC; Department personnel reviewed daily records, incident reports, Sheriff's Emergency Response Team (SERT) records and logbook records for potential issues, inmate discipline, employee discipline, medical issues and inmate injuries; and staff meetings with captains, lieutenants, and sergeants were held during which institutional issues were discussed. None of these reviews or meetings indicated any concerns relative to inmates being injured while ascending to or descending from bunk beds.

**SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 9th DAY OF NOVEMBER, 2007**

                                            /s/ Gerard J. Horgan
                                            Gerard J. Horgan