David M. Golden, et al. vs. County of Suffolk
Superintendent Gerard Horgan                           September 13, 2007

Volume: I
Pages: 1-94
Exhibits: 1-27

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 04-10835-MEL

DAVID M. GOLDEN, et al.,

    Plaintiffs

vs.

COUNTY OF SUFFOLK,

    Defendant

DEPOSITION OF: SUPERINTENDENT GERARD HORGAN

SUFFOLK COUNTY SHERIFF'S DEPARTMENT

Suffolk House of Correction

20 Bradston Street

Boston, MA 02118-2705

September 13, 2007

GABRIEL & SWEENEY COURT REPORTING
15 Van Wart Path | 19 Summer Street
Newton, MA 02459 | Acton, MA 01720
(617) 969-4791 Phone (978) 266-1352
(617) 964-1321  Fax  (978) 263-0669

Virginia Dodge
Certified Realtime Reporter
GABRIEL & SWEENEY COURT REPORTING

Virginia Dodge, CRR - Gabriel & Sweeney Court Reporting

Q. There's nothing in writing on that?
A. No.
Q. Is an inmate allowed to put additional furniture in a cell?
A. No.
Q. As of February 2003, what was the Suffolk County Sheriff Department knowledge of a safe way for an inmate to get up to the top bunk in --

MS. FABELLA: Just note my objection to the form of the question. I'm sorry.

Q. (By Mr. Tobin) -- in Cell No. 19, Unit 4-3?
A. I mean, I can't speak to what the inmates, you know, what their knowledge is. What I can speak to is what I've observed. I've seen inmates step on the chair to get up, step on the window sill to get up, step on the table to get up. Sometimes just pull themselves up, step on the bottom bunk and kind of pull themselves up as well. I've seen inmates do all of that.
Q. In February 2003, did the sheriff's department have knowledge of the safest way to get up onto the upper bunk?
A. Safest way? No.
Q. As of February 2003, did the sheriff's department consult with any type of safety consultants to determine the safest way or a safe way?

MS. FABELLA: Again, just note my objection to the form of the question.

You can answer.

A. We're audited twice a year by the Department of Correction, and they come in and give us safety tips every time they come in. They come in once to do a preliminary audit and then to do a final audit.

And I've been doing those audits for 10 years. And they've never indicated to us a better way or a worse way for inmates to get up on the top bunk. It's never been an issue when they've come in and audited us.

Q. (By Mr. Tobin) Have you ever asked them about that issue?

A. We ask them frequently about it. "When you walk around, can you tell us something -- if you see something, fresh set of eyes, that would make this place run better and be more safe, let us know."

Specifically about bunk beds, no. But that general -- and they give us ideas and input on a lot of matters, but they've never mentioned bunk beds.

Q. You mentioned that you've -- so the Suffolk County Sheriff Department knowledge as to the safe way to get up to the bed is obtained from observing how the inmates do it?

table was capable of holding?

A. I don't.

Q. Have you yourself ever stepped up on a table?

A. Yes.

Q. Can you tell us the dimensions of the table? How high is it?

A. I don't know.

Q. As of February 2003, had the Suffolk County Sheriff's Department ever given any consideration of doing anything to minimize the chance of an inmate getting injured while trying to climb up to the top bunk?

A. Yes.

Q. And what was that?

A. There was a discussion about putting a ladder that was attached to the top bunk and the bottom bunks, Bunk A and B, to have the inmate climb up on the ladder.

Q. And do you remember when that discussion happened roughly?

A. It would have been before I went back to the jail in January of 2003. I'm not sure of the exact date. It would have been in the early 2000s.

Q. Before January '03?

A. Yes.

Q. And what were the reasons for those discussions?

A. We have an inmate grievance coordinator. And part of that person's role is to identify potential issues that may come up from time to time. And I think an issue came up where someone fell off of a bunk and filed a grievance. And he brought that up through the chain of command. He brought that up through the command staff.

And there was a conversation that the superintendent at that time held with a number of other command staff members regarding the pros and cons, the merits or the downsides, of having ladders in the cells.

Q. And what was ultimate -- what were those pros and cons?

A. Basically that if you have a ladder in the cell, if someone is suicidal, that's a potential for them to hang themselves from the ladder. That was a definite con.

Kind of the pros and cons were that someone climbing up on a ladder could fall as well. So we didn't view that to be a failsafe option.

I think what happened was there was a cost-benefit analysis or a risk analysis done, and a determination was made that the ladders were not a cure-all and would not solve the problem -- not completely solve the problem or even solve the problem a little bit and potentially could cause another one with suicide risk.

Q. Were there any written documents generated regarding that analysis?

A. I don't think so. No.

Q. It was oral discussion?

A. It was a meeting. Yes.

Q. Other than that discussion that you told us about, were there any other considerations given to doing things to minimize the risk of an inmate being injured climbing up to the top bunk?

A. Again, at the time, I oversaw inmate grievances, and we do something that's called a climate control analysis. We look at issues that are coming up. For example, if we have a lot of issues on inmates losing property and filing grievances, that's something we react to.

Inmates falling out of bunk beds didn't happen that often, and it wasn't something we viewed as an epidemic by any stretch. If you were to list the top ten reasons for grievances, bunk beds were nowhere near the top ten and very rarely came up.

So I think from our perspective, it was an issue that was not percolating, and it was an issue that was not something that needed immediate attention because it really wasn't happening.

Q. Was there ever any consideration given to putting

before January '03 from an individual who claimed he somehow got hurt as a result of trying to get up on a bunk bed --

A. Yes.

Q. -- is that your memory?

A. Yes. I don't know if got hurt, but the issue of falling. I'm not sure if it resulted in injury, but it was something that the grievance coordinator thought he should bring to our attention.

Q. Other than that incident, was Suffolk County Sheriff's Department aware before February 3, 2003 of any other inmates claiming they were injured while trying to get up or down from the upper bunk?

A. I know, for example, in the calendar year 2002, there were seven such claims. And again, I think you have to put it in perspective. You look at the year 2002, our average daily population was somewhere between 1500 and 1900, depending on the time. We had over 5,000 people committed to us that year.

And I also know out of those seven claims, at least one or two of them were proven to be false. The inmates had issues, and the inmates knew that there was a protocol if they needed a bottom bunk for a medical reason, they could get it.

Q. Before February 2003, was there any policy or procedure at the Suffolk County Sheriff's Department to review these records to see what type of injuries were allegedly happening on the premises?

A. Yes.

Q. And how would that -- what was the manner that that would work?

A. There is a health service administrator who oversees all the medical staff, the doctors, the midlevel practitioners, the nurses, other people, too, but there is a weekly meeting that is held with issues that occur during the course of the week, hot topics, if you would.

And there is a -- at the time, actually, I was in that role where I would meet with the HSA every week and talk about issues that may or may not have come up medically that we needed to address.

Q. Do you recall ever participating in an HSA meeting where the issue of inmates being injured, going up to or down from the top bunk was ever discussed?

A. No.

Q. Is HSA an arm of the sheriff's department or is that a contractor?

A. A contractor at the house of correction. At the jail, it's different, but I think we're talking about the

house, so --

Q. Other than those HSA-type meetings, was there any other procedure in effect at the Suffolk County Sheriff's Department where the SERT records or the logbook records would be reviewed by anybody?

A. Yes.

Q. What was that procedure?

A. There is a major of operations and a deputy superintendent of operations. They would periodically review logbooks.

In addition to that, they would hold staff meetings with captains, with lieutenants, with sergeants, on a periodic basis to discuss relevant security issues. There's also labor relation meetings that existed and still exist to talk about health and safety issues with representatives from the various units. So there are a number of different mechanisms for that.

Q. And to your knowledge, did any of those reviews revolve around the issue of inmates being injured going up or down from the top bunk?

A. No. Again, it happened infrequently, and we didn't view it to be an issue.

MS. FABELLA: And this is before 2003, you're asking?

As of February 3, 2003, did the Suffolk County Sheriff's Department take any action as a result of becoming aware of allegations that inmates were injured while going up or down from the top bunk other than you've already testified to?

MS. FABELLA: Note my objection. It presupposes that they were aware.

And you can answer.

A. We didn't at that time, nor at this time do we see this to be an overwhelming safety issue or potential injury issue.

As I had indicated earlier, there's no -- if there was an easy fix to this, if there was a black-and-white answer, we would have done it.

One of the gentlemen's whose documentation I just reviewed -- I think it was the first one. He's what's known as a Q5. A Q5 is someone who has either attempted to commit suicide or ideated suicidal tendencies while in police custody at some time in the past. So in my mind, from looking at his records, if he had access to a ladder in his cell, we could be here for another reason, for a possible inmate death.

So in my mind, there was not a security or safety issue that existed because of the beds. Again, in my mind