UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DAVID M. GOLDEN, et. al.,  )
Plaintiffs  )
 )
v.  )     CIVIL ACTION NO: 04-10835-MEL
 )
COUNTY OF SUFFOLK,  )
Defendant  )

## DEFENDANT'S RESPONSE TO PLAINTIFF'S CONSOLIDATED REQUEST FOR INTERROGATORIES

Pursuant to Federal Rules of Civil Procedure 33, the Defendant, County of Suffolk, by and through its attorney Ellen M. Caulo, hereby responds to Plaintiff's Consolidated Request for Interrogatories.

## GENERAL OBJECTIONS

1.    Defendant objects to each interrogatory to the extent that they seek information protected by the attorney-client privilege and/or work product doctrine or any other applicable privilege or immunity. In the event that any privileged information is produced by the Defendant, such production is inadvertent and nor intended as a waiver of any privilege.

2.    Defendant objects to each interrogatory to the extent that they seek information not within the Defendant's possession, custody or control.

3.    Defendant objects to each interrogatory to the extent that they are overly broad, duplicative, vague and ambiguous, and unduly burdensome.

4.    Defendant objects to interrogatories to the extent that they call for the production of information that is not relevant to the subject matter of this litigation and is not reasonably calculated to lead to the discovery of relevant information.

5.    Defendant object to the interrogatories to the extent they call for information that is available from public sources or which can be more readily obtained from other sources that are equally available to Plaintiffs as they are to the Defendant.

1

Wisniewski -  SHOC, Unit 4-1, cell 24, 5/18/03

**RESPONSE TO INTERROGATORY NO. 3:**

Plaintiff Michael Dwyer was not assigned to cell 36 in Unit 24 on 1/17/03.  The remaining Plaintiffs were assigned to the cells as designated in Interrogatory No. 3 on the designated dates.

**INTERROGATORY NO. 4:**

If your answer to question 3 above is in any respect "no", please identify the facility, unit and cell number where such plaintiff was assigned to and/or housed on such date.

**RESPONSE TO INTERROGATORY NO. 4:**

Plaintiff Michael Dwyer was assigned to Unit 24 cell 2 at the Nashua Street Jail (NSJ) on 1/17/03.

**INTERROGATORY NO. 5:**

Please state the appropriate square footage of each cell referred to in your answer to question 3, above.

**RESPONSE TO INTERROGATORY NO. 5:**

Unit 4-2 cell 48, Unit 4-3 cell 19 and Unit 4-1 cell 24, all of which are located at the HOC, are each 122.75 square feet. Unit 3-4 cell 23 and Unit 3-3 cell 40, also located at the HOC, are each 70.09 square feet.  Unit 24 cell 2 located at the NSJ is 69.78 square feet.

**INTERROGATORY NO. 6:**

Please state the total number of inmates assigned to and/or housed in each of the cells referred to in question 3 above on such date(s).

**RESPONSE TO INTERROGATORY NO. 6:**

Each cell designated in Interrogatory No. 3 was assigned three inmates on the designated date(s) with the exception of Unit 24 cell 2, (NSJ) which was assigned two inmates.

**INTERROGATORY NO. 7:**

Please state the number of beds existing in each of said cells on said dates, including whether or not said beds included an upper bunk bed.

3

ORIGINAL

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 04-10835-MEL

DAVID M. GOLDEN, et al., |
|
            Plaintiffs |
|
vs. |
|
COUNTY OF SUFFOLK, |
|
            Defendant |

DEPOSITION OF:  SUPERINTENDENT GERARD HORGAN

SUFFOLK COUNTY SHERIFF'S DEPARTMENT

Suffolk House of Correction

20 Bradston Street

Boston, MA 02118-2705

September 13, 2007

**GABRIEL & SWEENEY COURT REPORTING**
15 Van Wart Path | 19 Summer Street
Newton, MA 02459 | Acton, MA  01720
(617) 969-4791 Phone (978) 266-1352
(617) 964-1321  Fax  (978) 263-0669

Virginia Dodge
Certified Realtime Reporter

1  Sheriff's Department?

2  A.    I'm the superintendent of the house of correction,

3  and I also serve as the special sheriff, which is a

4  position in the event of the sheriff being unavailable or

5  incapacitated, I serve as acting sheriff.

6  Q.    How long have you been the superintendent of the

7  house of correction?

8  A.    Since January 2003 -- I'm sorry.  Since

9  November 2003.

10  Q.    And how long have you been employed with Suffolk

11  County Sheriff's Department?

12  A.    Since August of 1987.

13  Q.    What was your initial position?

14  A.    I started off in the personnel department as an

15  administrative assistant in 1987.  In 1988, I became the

16  assistant personnel director at the old Charles Street

17  Jail.  And then I became the personnel director in 1994 of

18  the then Nashua Street facility.

19      In 1997, I became a deputy superintendent of support

20  services at our pretrial facility at Nashua Street.  In

21  1999, I became a deputy superintendent here at the house

22  of correction.  I was the deputy superintendent of support

23  services and program services.

24      In January 2003, I became superintendent of the

1    Nashua Street facility.  And then in November of 2003, I

2    became superintendent of the house of correction and

3    special sheriff.

4    Q.    And were you employed before 1987?

5    A.    I was.

6    Q.    Just generally, what were you doing?

7    A.    I was a payroll representative for TAD Technical

8    Institute.  It was my first job out of college.

9    Q.    What are your duties of your function as

10   superintendent of the house of correction?

11   A.    I'm responsible for the day-to-day operation of the

12   facility.  I ensure that the policies and procedures of

13   the sheriff's department are followed.  I ensure that the

14   operation runs well every day.

15        I oversee command staff that has oversight of both

16   the 550 security members, uniformed staff officers.  I'm

17   also the medical department, all programs classification.

18   I'm responsible for promoting people, for -- I'm a member

19   of the policy review committee.

20        I will deal with other agencies as the case or the

21   need arises.  Sometimes I deal with the courts.  Sometimes

22   I deal with other sheriff's departments.  Basically the

23   day-to-day operation of the facility.

24   Q.    And do you have any superior here at the house of

1   correction?

2   A.   I do.

3   Q.   Who is your superior?

4   A.   Chief of Staff Anne Powers and Sheriff Cabral.

5   Q.   Now, the Suffolk County House of Correction, what's

6   the address of the facility?

7   A.   20 Bradston Street, Boston, Mass. 02118.

8   Q.   And do you know when that became operational as far

9   as holding inmates?

10  A.   Yes.  December 1991.

11  Q.   And do you recall who was sheriff at that time?

12  A.   In 1991, it was Sheriff Robert Rufo.

13  Q.   The Suffolk County Jail, can you tell us the address

14  of that facility at this time?

15  A.   200 Nashua Street, Boston, Mass. 02114.

16  Q.   And do you recall when that became operational as

17  far as holding detainees?

18  A.   Yes.  May of 1990.

19  Q.   I want to show you this letter, which you may or may

20  not have seen.  It's a letter that was sent in response to

21  a keeper of records subpoena with Department of Capital

22  Asset Management.  And I just want to -- you may have not

23  seen it.  I just want you to take a look at that.

24          MS. FABELLA:  I guess my question is -- we

```
 1        question.

 2             You can answer.

 3   A.    I don't know that for sure.  This letter references

 4   the fact that they're reinforced 300 pounds.  But this is

 5   the first I've even seen it.

 6             MS. FABELLA:  He's already testified that

 7        he's never seen this letter before, so --

 8   Q.    (By Mr. Tobin)  In 2003, was it the Suffolk County

 9   Sheriff's Department's intention that the butcher block

10   tables be capable of holding inmates up to 300 pounds?

11   A.    I don't know.

12   Q.    Do you know if anybody else in the Suffolk County

13   Sheriff's Department would know the answer to that?

14   A.    Possibly maintenance.

15   Q.    Do you know if Hyman Stubbins, Inc. had a role in

16   building the facility at Suffolk House of Correction?

17             MS. FABELLA:  Again, I object to that

18        question.  It's beyond the scope of the

19        30(b)(6).

20             You can answer.

21   A.    I think they were the architect who designed the

22   facility.

23   Q.    (By Mr. Tobin)  In 2003, were certain cells at

24   Suffolk County House of Correction being occupied by three
```

1   inmates?

2   A.    Yes.

3   Q.    Is that called triple bunking?

4   A.    Yes.

5   Q.    Can you tell us the reasons for that?

6   A.    Basically we have people -- inmates, men and

7   women -- sent to us from the court.  They're sent to us

8   for a period of time or sentence, and what we do is we try

9   to look at the number of people that are committed to our

10  custody and care and make a determination of the best way

11  to house them.

12        So there will be times because of the number of

13  people committed to us that we do have to use multi-

14  occupancy cells.

15  Q.    Is that like an overcrowding situation?

16  A.    At times, yes.

17  Q.    Is there a Unit 4-3 at Suffolk House of Correction?

18  A.    Yes, there is.

19  Q.    And is there a Cell No. 19 in Unit 4-3?

20  A.    Yes, there is.

21  Q.    Were inmates assigned to that cell in February 2003?

22  A.    Yes.

23  Q.    And is there any reason an inmate would be assigned

24  to the 4-3 unit?  Has that got any particular

1    A.    That's correct.

2    Q..   And how many beds were there in Cell 19, Unit 4-3,

3    as of February 2003?

4    A.    Three.

5    Q.    And where were they located?

6    A.    Where they're depicted in the picture now that

7    you're showing me.  Exhibit 2 actually is the one that

8    shows all three of them.

9    Q.    And that would be a single bed on the right side of

10   the cell as you're looking into the cell?

11   A.    Yes.

12   Q.    And a bottom bunk on the left side of the cell as

13   you look in?

14   A.    Yes.

15   Q.    And a top bunk on the left side as you look in?

16   A.    Yes.  Actually, we refer to each one of the beds by

17   letter.  The bottom bunk in the left-hand side of

18   Exhibit 2 is Bunk A.  The top bunk is Bunk B, and the bunk

19   on the right-hand side is Bunk C.

20   Q.    Do you know the height of the top bunk, Bunk B, from

21   the floor?

22   A.    Not off the top of my head.  No.

23   Q.    Is it approximately 5 feet?

24   A.    In that ballpark.  Yes.

```
 1  Q.    There's nothing in writing on that?
 2  A.    No.
 3  Q.    Is an inmate allowed to put additional furniture in
 4  a cell?
 5  A.    No.
 6  Q.    As of February 2003, what was the Suffolk County
 7  Sheriff Department knowledge of a safe way for an inmate
 8  to get up to the top bunk in --
 9        MS. FABELLA:  Just note my objection to the
10        form of the question.  I'm sorry.
11  Q.    (By Mr. Tobin)  -- in Cell No. 19, Unit 4-3?
12  A.    I mean, I can't speak to what the inmates, you know,
13  what their knowledge is.  What I can speak to is what I've
14  observed.  I've seen inmates step on the chair to get up,
15  step on the window sill to get up, step on the table to
16  get up.  Sometimes just pull themselves up, step on the
17  bottom bunk and kind of pull themselves up as well.  I've
18  seen inmates do all of that.
19  Q.    In February 2003, did the sheriff's department have
20  knowledge of the safest way to get up onto the upper bunk?
21  A.    Safest way?  No.
22  Q.    As of February 2003, did the sheriff's department
23  consult with any type of safety consultants to determine
24  the safest way or a safe way?
```

GABRIEL & SWEENEY COURT REPORTING

1        MS. FABELLA:  Again, just note my objection

2        to the form of the question.

3        You can answer.

4   A.    We're audited twice a year by the Department of

5   Correction, and they come in and give us safety tips every

6   time they come in.  They come in once to do a preliminary

7   audit and then to do a final audit.

8        And I've been doing those audits for 10 years.  And

9   they've never indicated to us a better way or a worse way

10  for inmates to get up on the top bunk.  It's never been an

11  issue when they've come in and audited us.

12  Q.    (By Mr. Tobin)  Have you ever asked them about that

13  issue?

14  A.    We ask them frequently about it.  "When you walk

15  around, can you tell us something -- if you see something,

16  fresh set of eyes, that would make this place run better

17  and be more safe, let us know."

18       Specifically about bunk beds, no.  But that

19  general -- and they give us ideas and input on a lot of

20  matters, but they've never mentioned bunk beds.

21  Q.    You mentioned that you've -- so the Suffolk County

22  Sheriff Department knowledge as to the safe way to get up

23  to the bed is obtained from observing how the inmates do

24  it?

1   A.  *  Well, I think there are a number of safe ways to get

2   up, whether it be stepping on the bottom bunk, stepping on

3   the chair, stepping on the table.  I think any of those

4   ways is a safe way.

5           MS. FABELLA:  Again, note my objection

6           specifically to the phrase "Suffolk County

7           Sheriff's Department."

8           MR. TOBIN:  I'm sorry.  Could you please

9           read back the answer?

10

11                    *   (Answer read.)

12

13   Q.    (By Mr. Tobin)  Other than those three, as of

14   February 2003, did the Suffolk County Sheriff's Department

15   have knowledge of any other safe ways to get up to the

16   upper bunk?

17   A.    Not to my knowledge.  No.

18   Q.    You mentioned with regard to Photograph No. 2

19   stepping on the bottom bunk?

20   A.    Yes.

21   Q.    What was Suffolk County Sheriff's knowledge of the

22   specific way that an inmate would safely go up to the top

23   bunk by stepping on the bottom bunk?

24           MS. FABELLA:  Again, I'm going to object.

1    A.    We have an inmate grievance coordinator.  And part

2    of that person's role is to identify potential issues that

3    may come up from time to time.  And I think an issue came

4    up where someone fell off of a bunk and filed a grievance.

5    And he brought that up through the chain of command.  He

6    brought that up through the command staff.

7         And there was a conversation that the superintendent

8    at that time held with a number of other command staff

9    members regarding the pros and cons, the merits or the

10   downsides, of having ladders in the cells.

11   Q.    And what was ultimate -- what were those pros and

12   cons?

13   A.    Basically that if you have a ladder in the cell, if

14   someone is suicidal, that's a potential for them to hang

15   themselves from the ladder.  That was a definite con.

16        Kind of the pros and cons were that someone climbing

17   up on a ladder could fall as well.  So we didn't view that

18   to be a failsafe option.

19        I think what happened was there was a cost-benefit

20   analysis or a risk analysis done, and a determination was

21   made that the ladders were not a cure-all and would not

22   solve the problem -- not completely solve the problem or

23   even solve the problem a little bit and potentially could

24   cause another one with suicide risk.

1  any kind of a device into the wall for them to step onto?

2  A.    I'm trying to think if we talked about that.   I'm

3  not sure if we talked about that in the meeting, but I

4  know -- I can tell you from my own knowledge and my own

5  assessment of the cells subsequent to February of 2003,

6  actually subsequent to November of 2003, the issue I think

7  of is the unencumbered living space.  And if you put

8  another device in the cell, you're not going to have that

9  unencumbered living space.

10  Q.    What about a small object that would screw into the

11  wall for them to step on?

12  A.    Still a potential suicide risk.

13  Q.    How so?

14  A.    If you can get something behind that, you could hang

15  a sheet and sit down and hang yourself.

16  Q.    In February 2003, were inmates given any

17  instructions as to how to get up onto the upper bunk?

18  A.    No.

19  Q.    After February 2003, have inmates been given

20  instructions on how to get up to the upper bunk?

21       MS. FABELLA:  Just note my objection.

22       You can answer.

23  A.    No.

24  Q.    (By Mr. Tobin)  You mentioned about a grievance

1    bunk slips.  And they still exist today.

2    Q.    (By Mr. Tobin)  Before February 3, '03, if an inmate

3    claimed that he was injured while trying to climb up to or

4    down from a top bunk, did the protocol call for records to

5    be generated about that?

6    A.    Yes.

7    Q.    And what would those records be?

8    A.    What would happen is if an inmate fell or allegedly

9    fell from a bunk, the unit officer would call a SERT team.

10   A SERT team is Sheriff's Escort and Response Team.  They

11   would come in, and there would be medical review done to

12   determine whether there needed to be additional medical

13   care.

14        And anytime -- if a SERT team came into a unit,

15   there's a unit logbook that exists that logs in people

16   that come in and out.  So for example, if Inmate Gerard

17   Horgan fell out of a bunk or there was an incident in the

18   cell, a SERT team would have come into the unit.  That

19   would have been noted in the log.  That would have said

20   "SERT team so-and-so with this officer and that officer in

21   to respond to Gerard Horgan incident in the cell."

22        In addition to that, there would have been

23   documentation of a medical nature.  If there was a medical

24   issue, it would be in the inmate's medical file.

1   Q.    Before February 2003, was there any policy or

2   procedure at the Suffolk County Sheriff's Department to

3   review these records to see what type of injuries were

4   allegedly happening on the premises?

5   A.    Yes.

6   Q.    And how would that -- what was the manner that that

7   would work?

8   A.    There is a health service administrator who oversees

9   all the medical staff, the doctors, the midlevel

10  practitioners, the nurses, other people, too, but there is

11  a weekly meeting that is held with issues that occur

12  during the course of the week, hot topics, if you would.

13      And there is a -- at the time, actually, I was in

14  that role where I would meet with the HSA every week and

15  talk about issues that may or may not have come up

16  medically that we needed to address.

17  Q.    Do you recall ever participating in an HSA meeting

18  where the issue of inmates being injured, going up to or

19  down from the top bunk was ever discussed?

20  A.    No.

21  Q.    Is HSA an arm of the sheriff's department or is that

22  a contractor?

23  A.    A contractor at the house of correction.  At the

24  jail, it's different, but I think we're talking about the

1    house, so --

2    Q.    Other than those HSA-type meetings, was there any

3    other procedure in effect at the Suffolk County Sheriff's

4    Department where the SERT records or the logbook records

5    would be reviewed by anybody?

6    A.    Yes.

7    Q.    What was that procedure?

8    A.    There is a major of operations and a deputy

9    superintendent of operations.  They would periodically

10   review logbooks.

11       In addition to that, they would hold staff meetings

12   with captains, with lieutenants, with sergeants, on a

13   periodic basis to discuss relevant security issues.

14   There's also labor relation meetings that existed and

15   still exist to talk about health and safety issues with

16   representatives from the various units.  So there are a

17   number of different mechanisms for that.

18   Q.    And to your knowledge, did any of those reviews

19   revolve around the issue of inmates being injured going up

20   or down from the top bunk?

21   A.    No.  Again, it happened infrequently, and we didn't

22   view it to be an issue.

23            MS. FABELLA:  And this is before 2003,

24       you're asking?

GABRIEL & SWEENEY COURT REPORTING

1  course of business that unit officers will record

2  activities that happened in a given housing unit during a

3  different shift on a different day.  And basically, it

4  will give you a summary of what happened during their tour

5  of duty.

6  Q.    And that was my next question.  The writing that we

7  see on the logbook is written in by the corrections

8  officer?

9  A.    Yes.

10  Q.    And is that the correction officer who's guarding

11  that particular unit?

12  A.    Yeah.  Sometimes it may be more than one officer in

13  a unit.  The logbook you showed me had multiple officers

14  on because it's such a large unit.  But typically, there

15  will be entries made by one of the officers who is

16  assigned to that unit.  Yes.

17  Q.    I'd like to direct your attention to the fifth page

18  of Exhibit 4, which is Bates stamped at the bottom 000062.

19  Just ask you if you could, take a look at that, please.

20        What is that document?

21  A.    This is what's known as a daily rap sheet or a daily

22  summary sheet.  It's the Building 3 rap sheet from

23  February 16, 2002.  And it summarizes what happened on the

24  day shift on that day.

1  Q.    And whose obligation is it to offer the rap sheet?

2  A.    The building supervisor.  Generally a lieutenant.

3  Q.    Do they use the logbook entries to write up their

4  rap sheet?

5  A.    That would be one -- more verbal communication with

6  the officers, what's going on, but the lieutenants do

7  review the logbook several times during the course of the

8  shift.  Yes.

9  Q.    I'd ask you to take a look at the item for

10  12:25 p.m. on that.

11  A.    12:15?

12  Q.    Is there a 12:25?

13  A.    No.  12:15.

14  Q.    I'm sorry.  12:15.  And could you just please read

15  that into the record?

16  A.    It says, "Man down.  Inmate Thomas Crosby, Booking

17  No. 0200164, Unit 3-1, Cell 23, complained of back injury

18  after accidentally slipping and destroying the face sink.

19  He was apparently attempting to gain access to his top

20  bunk by way of the sink.  He also sustained small

21  lacerations to right wrist/forearm.  SERT and medical

22  responded.  He was taken to the infirmary for further

23  examination."

24          MS. FABELLA:  Just note my objection.  The

1          document speaks for itself.

2     Q.    (By Mr. Tobin)   I'd like to show you the last page

3     of Exhibit 4, Bates stamped 000063.   And if you could,

4     just take a look at that.

5     A.    Yes.

6     Q.    Can you tell us what that document is?

7     A.    This is a daily activity sheet of the SERT team.

8     SERT again is Sheriff's Escort and Response Team.   This is

9     the summary sheet for the day shift on February 16, 2002.

10    Q.    And whose obligation is it to author the SERT

11    reports?

12    A.    The SERT supervisor or supervisors.

13    Q.    And what is the function of the SERT team?

14    A.    They respond to emergencies.   They provide escorts

15    to inmates going throughout the facility.   They provide

16    lunch reliefs.   They respond to fights.   They provide

17    out-of-perimeter patrols outside of the facility.   They

18    again take inmates from one unit to another when the

19    housing unit changes.   They do a number of different

20    things during the course of the day.

21    Q.    I would like to show you this document, which is

22    Bates stamped 00072.   Ask you to just take a look at that.

23    A.    Yep.

24          MR. TOBIN:   Why don't we mark that as the

1        next exhibit, if we can?

2             MS. FABELLA:  Can you have him identify it

3        first, please?

4             MR. TOBIN:  Sure.

5    Q.    (By Mr. Tobin)  Could you just tell us what that is?

6    A.    This is the Building 3 summary sheet, daily summary

7    sheet, for the 3-to-11 shift on January 15, 2003.

8             MR. TOBIN:  And could we mark that as the

9        next exhibit, please?

10            (Exhibit 5, Building 3 rap sheet dated 1/15/03,

11            marked.)

12   Q.    (By Mr. Tobin)  And that is a -- that is a rap

13   sheet?

14   A.    Yes, it is.

15   Q.    And the date on that is 1/15/03?

16   A.    Yes.  That's correct.

17   Q.    And recognizing that the document does speak for

18   itself, could you please read in the entry for 6:21 p.m.?

19            MS. FABELLA:  Again, just note my

20        objection.

21            You can answer.

22   A.    "Man down, Unit 3-3.  Inmate Edward Ellie's Booking

23   No. 020-4282, Cell No. 40, fell off top bunk, received a

24   cut over left eye.  He was seen by medical, taken to

1    infirmary via wheelchair for treatment.  Inmate Ellie

2    later sent to BMC for stitches."

3    Q.    (By Mr. Tobin)  Showing you a document Bates stamped

4    00051, could you just take a look at that and let us know

5    when you're done?

6    A.    Okay.

7    Q.    And generally, could you tell us what that is?

8              MS. FABELLA:  Can you ask him whether or

9          not he recognizes that document and whether or

10         not he's ever seen it before?

11   Q.    (By Mr. Tobin)  Have you ever seen it before?

12   A.    No, I have not.

13   Q.    Can you just tell us what it purports to be or even

14   who it's from?

15   A.    It's a letter from an attorney.  It's a tort claim

16   on behalf of an inmate he has as a client.

17             MR. TOBIN:  And could we mark that as the

18         next exhibit, please?

19             (Exhibit 6, Letter, marked.)

20   Q.    (By Mr. Tobin)  Does that document indicate a date

21   that it was received by the Suffolk County Sheriff's

22   Department?

23   A.    February 4, 2001.

24   Q.    Do you have any reason to doubt that that document

1  was received by the Suffolk County Sheriff's Department on

2  February 4, 2001?

3  A.    Yes.

4  Q.    Why do you say that?

5  A.    The letter's dated January 2002.

6  Q.    That's a good reason.

7        MS. FABELLA:  Good catch.  That's

8        interesting.

9        MR. TOBIN:  That is.

10 Q.    (By Mr. Tobin)  Do you know when the document was

11 received by --

12 A.    I don't.

13 Q.    -- the Suffolk County Sheriff's Department?

14 A.    Unless we went back in time, I don't know.

15 Q.    And it could be that the attorney had the wrong date

16 on his letter.  I don't know.

17       Can you tell us what the writing up in the upper

18 right-hand corner of that letter, Exhibit 6, appears to

19 be?

20        MS. FABELLA:  I'm sorry.  Writing?  You

21        mean the stamp?

22        MR. TOBIN:  The stamp.  Yeah.

23 A.    That's a date stamp indicating that it had been

24 received by the sheriff's department.  And it's dated

1    February 4, 2001.

2    Q.    (By Mr. Tobin)  And was it the practice of the

3    Suffolk County Sheriff's Department in 2001 to stamp

4    lawyers' letters when they were received by the

5    department?

6    A.    Yes.

7    Q.    Does that appear to be a genuine date stamp from the

8    Suffolk County Sheriff's?

9    A.    Yes, it does.

10   Q.    And it references an individual by the name of

11   Sampson Scott.  Have you ever heard of him?

12   A.    No.

13   Q.    And could you just read into the record, please,

14   Paragraph 2, understanding that it says what it says?

15            MS. FABELLA:  I'm going to object to that.

16        Obviously the document speaks for itself.

17   A.    "On or about August 14, 2000, Sampson Scott was

18   being housed at Unit 2-2, Cell 27, in the Nashua Street

19   Jail.  For some reason, he was switched to Unit 2-2,

20   Cell 23, just before bedtime.

21        "As Mr. Scott attempted to climb onto the top bunk

22   of his new cell in order to sleep, the butcher block

23   counter he used to step on" -- I'm sorry -- "to step to

24   the top bunk gave way.  This caused him to fall, striking

1    a portion of the lower bunk and falling to the floor.  He

2    suffered injuries to his back, groin and arms as a result

3    of the fall."

4    Q.    (By Mr. Tobin)  Do you know if there was any kind of

5    a health services unit meeting with regard to that

6    incident?

7    A.    I was at the house of correction at the time.  I

8    don't.

9    Q.    And this refers to the jail?

10   A.    Yes.

11   Q.    I'd like to show you a two-page document Bates

12   stamped 00082 and 00083.  If you could, just take a look

13   at that.

14   A.    Okay.

15   Q.    Could you just tell us generally what that document

16   is?

17   A.    This is a report from an officer to his supervisor,

18   the lieutenant, indicating that a detainee by the name of

19   Michael Dwyer indicated that he fell out of his bunk at

20   the jail and hurt his ankle.

21            MR. TOBIN:  Why don't we mark that as the

22        next exhibit?

23            MS. FABELLA:  No objection.

24            (Exhibit 7, Memo dated 1/14/03, marked.)

1  Q.    (By Mr. Tobin)  And Superintendent Horgan, with

2  regard to Exhibit 7, is there an indication of the date

3  that that document was authored?

4  A.    Yes.  It is January 14, 2003.

5  Q.    I'm going to show you a two-page document Bates

6  stamped 00049 and 00050.  Just ask you to take a look at

7  that.

8       Generally, what does that letter purport to be -- or

9  that document?

10         MS. FABELLA:  I'm just going to ask if he

11         identifies whether or not he recognizes the

12         document, if you can do that.

13  Q.    (By Mr. Tobin)  Do you recognize it?

14  A.    I've never seen it before.  No.

15  Q.    Can you tell us what it purports to be generally?

16  A.    Generally, it's a letter from an attorney to Mayor

17  Menino and the Boston City Council, looking to settle

18  something -- basically an offer letter or a demand letter

19  basically saying, "If you don't make us an offer that we

20  want, we're going to go to court on an inmate injury."

21         MR. TOBIN:  Why don't we mark that as

22         Exhibit 8?

23            (Exhibit 8, Letter dated September 8, 1999,

24            marked.)

1    Q.    (By Mr. Tobin)    And superintendent, with regard to

2    this Exhibit 8, when letters like that come in, are they

3    generally sent to the sheriff's department at some point?

4    Are they made aware of these letters?

5    A.    Back in 1999, I'm not sure.  I mean, our

6    relationship with the city has changed a lot.  I really

7    can't say.  I'm not sure what happened in '99 or not.

8    Q.    Do you have any memory of the allegations set forth

9    in that letter?

10   A.    No.

11   Q.    And the date of the letter is --

12   A.    September 8, 1999.

13   Q.    And in general terms, it's an allegation of an

14   inmate being injured in some fashion while trying to go up

15   or down from an upper bunk?

16          MS. FABELLA:  I object because he's never

17          testified -- I'm sorry.  He testified that he

18          did not recognize this document, having never

19          seen it before.  So the document speaks for

20          itself.  We've marked it as an exhibit, so --

21   A.    I mean, basically it's an inmate saying that his

22   cell was dark and stepping off his bunk, he stepped on a

23   sink or toilet and fell.

24   Q.    (By Mr. Tobin)    Okay.  Thank you.

1          Let me show you a document Bates stamped 00054.

2     A.    Okay.

3     Q.    Do you recognize that document?

4     A.    No.

5     Q.    Can you tell us generally what it purports to be?

6     A.    It's a letter from an inmate who looks like he's

7     representing himself, claiming that he is very small in

8     stature.  He says he's 4 feet high, 4 feet in height, and

9     that he had to go up on a top bunk and he fell.

10         MR. TOBIN:  Could we mark that as the next

11         exhibit, please?

12         (Exhibit 9, Complaint dated 12/13/00, marked.)

13    Q.    (By Mr. Tobin)  And with regard to Exhibit 9, could

14    you just read for us the date that the document purports

15    to have been written, down in the lower left-hand corner?

16    A.    December 13, 2000.

17    Q.    I'd like to show you next a document Bates stamped

18    00056.  Do you recognize the document?

19    A.    Not specifically.  No.

20    Q.    Can you tell us generally what it purports to be?

21    A.    It was an inmate grievance form asking to get a cast

22    taken off of his arm.

23         MR. TOBIN:  And why don't we mark that as

24         the next exhibit, please?

1          (Exhibit 10, Inmate Grievance Form dated

2          August 16, 2000, marked.)

3   Q.    (By Mr. Tobin)  And with regard to Exhibit 10, does

4   it appear to be on an inmate grievance form that was in

5   use at the Suffolk County House of Correction?

6   A.    Yes.

7   Q.    And does it indicate a date that it purports to have

8   been written?

9   A.    August 16, 2000.

10  Q.    Have you ever seen that inmate -- that particular

11  inmate grievance?

12  A.    I don't see the inmate's name, and it doesn't ring a

13  bell.  No.

14  Q.    If I suggested Mario Celestin, does that ring a bell

15  at all?

16  A.    No.  That was the name on No. 9, though, right?

17  Q.    Yes.  I believe that's -- it's redacted, but that's

18  what it appears to be.  I could be wrong.

19        In any event, could you just please read for us what

20  his grievance is?

21          MS. FABELLA:  I'm going to continue to

22      object.

23          Off the record for a second.

24

1        (Off-record discussion.)

2

3        MS. FABELLA:  Back on the record.

4        I object to the reading of the document

5        into the record.  The document speaks for

6        itself.

7    Q.    (By Mr. Tobin)  If you could, just read it briefly,

8    and I'll cut you off so you don't have to go through the

9    whole thing.

10   A.    "I was in Unit 1-92, Cell No. 11, and I occupied the

11   top bunk.  The top bunk is about 5 feet, 4 inches from the

12   floor.  On 6/25/2000, I tried to get down from the top

13   bunk.  As I placed my foot on the top of the sink to get

14   down, I slipped and fell."

15   Q.    That's fine.  Thank you.

16        I'd like to show you a document Bates stamped

17   000491.

18        Can you tell us what that purports to be?

19   A.    It's an incident report to the captain from a

20   lieutenant, indicating that an inmate on the sixth floor

21   of the jail was lying on the floor of his cell, and the

22   inmate's roommate said that the inmate was climbing to his

23   top bunk and he fell to the floor, and that the inmate was

24   seen by medical.

```
1              MR. TOBIN:  Could we mark that as the next
2          exhibit, please?
3              (Exhibit 11, Incident report dated 10/21/02,
4              marked.)
5    Q.    (By Mr. Tobin)  And does Exhibit 11 state the date
6    on which the report was generated?
7    A.    10/21/02.
8    Q.    I'd like to show you a document Bates stamped
9    000493.  Ask you to take a look at that, please.
10   A.    Okay.
11   Q.    Can you just tell us what that document purports to
12   be?
13   A.    This is a Building 4 daily rap sheet for March 29,
14   2002, 3-to-11 shift.
15             MR. TOBIN:  And could we have that marked
16         as the next exhibit, please?
17             (Exhibit 12, Building 4 rap sheet for March 29,
18             2002, marked.)
19   Q.    (By Mr. Tobin)  And I'm sorry.  Did you tell us what
20   the date was?
21   A.    March 29, 2002.  Yes.
22   Q.    And could you read the entry for 6 p.m.?
23             MS. FABELLA:  Again, just note my objection
24         Document speaks for itself.
```

GABRIEL & SWEENEY COURT REPORTING

```
1    A.    "Man down on 4-2 unit.  Inmate name's redacted.
2    No. 0200218 fell down from -- fell coming down from his
3    top bunk.  Medical escorted Inmate blank to infirmary in a
4    wheelchair."
5    Q.    (By Mr. Tobin)  I'd like to show you this document
6    Bates stamped 000495.  Ask you to take a look at that and
7    tell us generally what it purports to be.
8    A.    It is a SERT rap sheet for Christmas Day, midnight
9    shift, 2002.
10           MR. TOBIN:  And could we mark that as the
11        next exhibit, please?
12           (Exhibit 13, SERT rap sheet, marked.)
13   Q.    (By Mr. Tobin)  Referring to Exhibit 10, could you
14   please read the note portion of it?
15           MS. FABELLA:  The record speaks for itself.
16        Just note my objection.
17           MR. TOBIN:  You can make that continuing.
18           MS. FABELLA:  Continuing objection to the
19        documents.
20   A.    Exhibit 13, the note indicates at approximately
21   10:25, inmate's name is redacted, Booking No. 0204550,
22   Unit 3-4, Cell 56, slipped and fell while climbing from
23   bunk.  Complained of back pain.  SERT and medical
24   personnel responded.  EMS activated.  He was transported
```

GABRIEL & SWEENEY COURT REPORTING

1    to BMC and returned.  Placed in the infirmary.

2    Q.    (By Mr. Tobin)   Showing you now document Bates

3    stamped 000497 and ask you to take a look at that.

4    A.    This is a shift commander's rap sheet dated

5    October 10, 2002 for the 3-to-11 shift.

6    Q.    Thank you.

7          MR. TOBIN:   Could we mark that as the next

8          exhibit?

9          (Exhibit 14, Shift commandeer's rap sheet dated

10         October 10, 2002, marked.)

11   Q.    (By Mr. Tobin)   And subject to the continuing

12   objection, could you please read in the reference for

13   10:05 p.m.?

14   A.    "Man down in Unit 3-2.  Inmate's name redacted,

15   Booking No. 0203596, Cell 59, did fall and cut himself

16   climbing back in his bunk.  Inmate will need stitches.

17   Will be going to BMC."

18   Q.    I'd like to show you a document Bates stamped

19   000499.  Ask you to take a look at that, please.

20   A.    This is the shift commander rap sheet for Monday,

21   September 16, 2002 for the day shift.

22         MR. TOBIN:   Could we mark that as the next

23         exhibit, please?

24

1              (Exhibit 15, Shift commander rap sheet dated

2              September 16, 2002, marked.)

3    Q.    (By Mr. Tobin)   Subject to the objection, could you

4    please read in the reference for 11:15 a.m.?

5    A.    "Man down called in Unit 110-2, Cell No. 4.   Inmate

6    name redacted.   Booking No. 0201672."   It says "feel," but

7    I think it means "fell" -- "while trying to get onto the

8    top bunk.   SERT and medical responded.   Transported to the

9    infirmary.   Seen by the medical staff and sent back to our

10   unit."

11   Q.    Showing you a document Bates stamped 00506.   Take a

12   look at that.

13   A.    This is a Building 1 rap sheet from November 6,

14   2002.

15              MR. TOBIN:   Could we mark that as the next

16        exhibit?

17              (Exhibit 16, Building 1 rap sheet dated

18              November 6, 2002, marked.)

19   Q.    (By Mr. Tobin)   Could you please, subject to the

20   objection, read in the 6:27 p.m. reference?

21   A.    "Man down.   Inmate's name redacted.   Booking

22   No. 0203842, Unit 110-2, Cell 9.   Slipped and fell while

23   attempting to get on her top bunk.   She complained of back

24   pain.   SERT and medical responded.   She was evaluated and

1    remained in the unit."

2    Q.    Does the Suffolk County Sheriff's Department have

3    any reason to believe that any of the information

4    contained in those exhibits that you just went through is

5    false, those specific ones?

6    A.    No.    Those documents look to be accurate.

7    Q.    But as far as the information being imparted that

8    inmates fell, does the Suffolk County Sheriff's Department

9    have any reason to believe that the allegation is false or

10   any of the specific ones?

11        MS. FABELLA:    Objection.    There are other

12        documents thereafter that go with those that

13        also show otherwise, so I just want to make

14        that objection on the record.

15        MR. TOBIN:    Do I have those?

16        MS. FABELLA:    Yeah.    You have everything.

17        Off the record for a second.

18        MR. TOBIN:    Yeah.    Why don't we go off the

19        record?

20

21            (Off-record discussion.)

22

23        MR. TOBIN:    Back on the record.

24        Counsel has pointed out that plaintiff's

1            MS. FABELLA:  Objection to the extent -- to

2        the form of the question.

3   A.    A small number of inmates have fallen.  Yes.

4   Q.    (By Mr. Tobin)  Do you know what that number is?

5            MS. FABELLA:  And this is before 2002?

6            MR. TOBIN:  Before 2002.

7   A.    For what time period?

8   Q.    (By Mr. Tobin)  Since the jail was in -- since the

9   house of correction was in operation.

10           MS. FABELLA:  1991?

11  A.    Off the top of my head, no.

12  Q.    (By Mr. Tobin)  The only way to determine that

13  accurately would be to review all the incident reports?

14  A.    Yeah.  If you're going to go back to 1991, that

15  would be an impossible task to do, I think.

16  Q.    I understand that, but I mean, that is the only way

17  to determine accurately the actual instances where inmates

18  have made the claim?

19  A.    What I can tell you is this.  My recollection as

20  someone who oversaw inmate grievances, oversaw the medical

21  department at both facilities, each year, there were a

22  very small number of people who may have fallen out of a

23  bed.

24        But again, there was a protocol in place, that if

Volume:    1
Pages:     1 - 191
Exhibits:  See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 04-10835-MEL

DAVID M. GOLDEN, et al.,                    )
                    Plaintiffs,             )
                                            )
            v.                              )
                                            )
COUNTY OF SUFFOLK,                          )
                    Defendant.              )

DEPOSITION OF **JOHN T. CONNOLLY, JR.**, a
Witness called on behalf of the Defendant, taken
pursuant to the applicable provisions of the
Federal Rules of Civil Procedure, before Maureen
Nashawaty, a Notary Public within and for the
Commonwealth of Massachusetts, held at the Nashua
Street Jail, 200 Nashua Street, Boston, MA, on
Tuesday, September 4, 2007 commencing at 1:30
p.m.

*COPLEY COURT REPORTING, Inc.*
58 Batterymarch Street
Boston, Massachusetts  02110
(617) 423-5841

34

A.    Yes.

Q.    Okay.  And when was it that you were assigned to a top bunk?

A.    For the end of 2002 and the beginning of 2003.

Q.    Okay.  How do you know that you were assigned to a top bunk?

A.    Actually that was the last I remembered because of the injury.  That is when I injured my arm.  That was probably one of the last times I was on a top bunk at South Bay.

MS. FABELLA:  Okay, move to strike as nonresponsive.

Q.    How do you know that you were assigned to a top bunk in the end of 2002?

MR. TOBIN:  Are you asking him how would he learn at the time that Connolly you have the top bunk?

MS. FABELLA:  Correct, back in the end of 2002.

Q.    Do you understand that question?

A.    How would I?

Q.    Did someone tell you you were assigned to the top bunk?

1       A.     Yes, that was my bunk when I went in

2   there, yes.

3       Q.     Who told you that that was your bunk?

4       A.     Whoever the officer was on that

5   particular given day.  I wouldn't know.  I

6   wouldn't remember.

7       Q.     So towards the end of 2002 when you

8   were assigned to a particular cell, an officer

9   told you that you are assigned to the top bunk

10  here, is that correct?

11      A.     Yes.

12      Q.     Just so I understand --

13      A.     Yes.

14      Q.     Were you given a slip, a bed slip?

15      A.     What they do, when you transfer -- they

16  do have a slip and it is given to the officer not

17  to me.  I wasn't given a slip.  The other officer

18  was.

19      Q.     And then they find a space for you and

20  they bring you to your cell, is that correct?

21      A.     Yes.

22      Q.     When you entered the unit?

23      A.     Yes, yes.

24      Q.     Okay.  All right.  We are going to

1    19 you were told which bed you would be assigned

2    to, correct?

3        A.    Right.

4        Q.    And an officer told you which cell you

5    were assigned to?

6        A.    At the time, he said that is my bunk

7    and when I went in there the bunk was open, and

8    that bunk was open and that is the bunk that I

9    was given, yes.

10        Q.    But earlier you testified that an

11    officer assigned you to that bunk, the top bunk

12    on that date?

13        A.    There is your bunk, yes, yes.

14        Q.    Okay.  Can you describe that cell for

15    me to the best of your recollection, Cell Number

16    19 on that day and tell me for example how many

17    beds there were and what items were in that

18    particular cell?

19        A.    3 beds and a chair, and I think there

20    were 3, I think we all had a bag that we put our

21    property in.

22        Q.    Okay.  And there was a sink and a

23    toilet?

24        A.    No.

56

1    times.

2        Q.    Okay.  And how is it that you got from

3    the floor to the top bunk?

4        A.    I would go from the chair to the window

5    to the bunk.

6        Q.    On each of those occasions?

7        A.    Excuse me?

8        Q.    On each of those occasions?

9        A.    Yes, usually, yes.

10        Q.    Was there any other manner that you got

11    up to the top bunk?

12        A.    There was really no other way you could

13    do it.

14        Q.    Did anyone at the department instruct

15    you on how to get from the floor to the top bunk?

16        A.    No.

17        Q.    Did you use the bottom bunk to lift

18    yourself up and hoist yourself up to the top

19    bunk?

20        A.    I would use the chair and the window.

21        Q.    Okay, but you never used the bottom

22    bunk?

23        A.    No.

24        Q.    Is there any particular reason that you

61

1    bed and I was on a chair.  That was pretty much

2    the routine.

3        Q.    Okay.  And at some point you decided to

4    go up to your bed?

5        A.    Yes.

6        Q.    Why did you decide to go up to your bed

7    at that point?

8        A.    I was tired and it was going to be an

9    hour or so before we got out for rec, so I

10   figured I would rest before we get out for rec.

11       Q.    Tell me what you did then?

12       A.    I went from the chair to the window,

13   and I was trying to get to the top bunk and the

14   leg buckled and I fell.

15       Q.    Okay.  Now, when you say the chair, can

16   you tell me, did you position the chair in a

17   certain location?

18       A.    Yes, I pretty much did it the same way

19   all of the time, against the wall, close to the

20   bunk, to the window, yes.

21       Q.    When you say against the wall, what

22   portion of the chair was against the wall?

23             For example, was the back of the chair

24   against the wall?  Was the back of the chair up

62

1    against the bunk?

2        A.    Yes, it would be the back to try to

3    give it as much support, yes, the back.

4        Q.    And the back was against which wall?

5        A.    The wall where the window is located,

6    the far wall.

7        Q.    Okay, all right.  So the seat of the

8    chair was facing where?

9        A.    The seat of the chair would be facing

10   out so I could get on it.

11       Q.    So it would be facing let's say the

12   door?

13       A.    Yes.

14       Q.    Okay.  So tell me exactly how you

15   stepped onto the chair, what foot did you use so

16   on and so forth?

17       A.    I am pretty sure I put my left foot

18   onto the chair and I was bringing my right foot

19   up to the chair and holding on to the top bunk --

20   you have to be an acrobat to get up there, so --

21   I am putting my left foot on -- and I was

22   bringing my right foot up -- the chair buckled

23   and I fell.

24       Q.    Where were your hands at this time?

63

1          A.    One of my hands was on the bunk -- to

2     steady myself.

3          Q.    Now you are showing me your left hand.

4                Does that mean your left hand was on

5     the bunk?

6          A.    Going up, the right hand would be here,

7     probably my left hand, yes.

8          Q.    So you are indicating that your left

9     hand was up first?

10         A.    My left, yes.

11         Q.    So you put your left foot and then your

12    left hand, is that correct?

13         A.    Yes, yes.

14         Q.    And what portion of the bunk bed were

15    you grabbing onto?

16         A.    To the side of the bunk.

17         Q.    Okay.

18         A.    So the top of the bunk, yes.

19         Q.    You were hoisting yourself up onto the

20    chair?

21         A.    Yes.

22         Q.    And where was your right hand at that

23    point?

24         A.    I was going to bring my right hand up

64

1      to grab on and the chair buckled at the time.

2          Q.    Had you gotten your right foot onto the

3      window sill at that point?

4          A.    I was bringing my right foot up. I was

5      bringing my right foot up and my weight on the

6      chair buckled.

7          Q.    But your right hand had not yet reached

8      the top bunk yet, is that correct?

9          A.    No.

10         Q.    And your right hand hadn't grabbed onto

11     anything like the window sill bars or anything

12     like that?

13         A.    No, not that I remember, no.

14         Q.    Now when you say the chair buckled, can

15     you tell me what you mean by that?

16         A.    One of the legs in the chair gave out.

17         Q.    Did it break?

18         A.    It buckled, it bent.

19         Q.    Okay. Do you know what type of a chair

20     it was? Was it a plastic chair or a metal chair

21     or a wooden chair?

22         A.    It was a plastic chair.

23         Q.    And when you say it gave out, did it

24     give out going under you? I mean the leg itself.

1    Did it go out or did it go to the side or

2    something else -- I am trying to understand how

3    the chair buckled?

4        A.    I don't know exactly how the leg

5    buckled but I was on top but I imagine it -- I

6    don't know which way it buckled then.

7        Q.    Do you remember which leg it was that

8    buckled?

9        A.    I think it was the left -- the rear

10   leg -- the left rear leg.

11       Q.    The left rear?

12       A.    Yes.

13       Q.    Okay.  How did the chair, withdrawn.

14            Did the chair sway to the left or to

15   the right at the time that you fell?

16       A.    It sort of like wobbled and I lost my,

17   when it went down, I am trying to think, let me

18   see -- it went to the left and out I think.

19       Q.    It went to the left and out?

20       A.    Yes.

21       Q.    And you mean your left, is that

22   correct?

23       A.    Towards the bunk, it flipped.

24       Q.    So it flipped towards the bunk?

121

1     privileged.

2               THE WITNESS:  Thank you.

3          Q.     We are not talking about

4     conversations -- just what your own personal

5     knowledge is as you sit here today about the

6     circumstances of a similar incident involving

7     Mr. Scott?

8          A.     I spoke with my attorney about it,

9     Attorney Tobin.

10         Q.     But you don't have any other knowledge

11    about it other than your conversations with your

12    attorney?

13         A.     Yes, right.

14         Q.     Okay.  So you were in the hospital you

15    said for eight days?

16         A.     Seven or eight days, yes.

17         Q.     Okay.

18         A.     Yes, the 3rd, yes.

19         Q.     Approximately?

20         A.     Yes, seven or eight days.

21         Q.     Did you undergo an operation while you

22    were there?

23         A.     Yes, I did.

24         Q.     Do you know off the top of your head

122

1    what your operation entailed?

2         A.    That they sought out removed the radial

3    head with a gigli saw.  When I read my medicals

4    in the past and I learned what a gigli saw was.

5         Q.    I don't need to know the medical

6    terms -- just in general terms.

7              You had an operation on your arm?

8         A.    Yes, and the radial head was removed.

9         Q.    Okay.

10        A.    And a cast was put on my wrist.

11        Q.    How far did the cast go up your arm I

12   should say?

13        A.    To about halfway up my forearm because

14   the stitches were here -- probably about here.

15        Q.    So your elbow was exposed?

16        A.    Yes, it had to be exposed, yes.

17        Q.    Did you have a sling or anything that

18   you were prescribed to wear?

19        A.    Yes.

20        Q.    Did you wear that?

21        A.    Yes.

22        Q.    How long did you wear that sling?

23        A.    Months.

24        Q.    How long was the cast on for?

170

1        Q.    And were you assigned to the top bunk

2    or the bottom bunk on that occasion?

3        A.    Off and on.

4        Q.    But you were assigned at some point to

5    the top bunk?

6        A.    Yes, but I think I was able to get a

7    bottom bunk most of the time there that I was

8    there.

9        Q.    Okay, but you were at some point

10   assigned to a bottom bunk?

11       A.    Yes, at different times.

12       Q.    And do they have ladders that went to

13   their top bunks?

14       A.    No, it was actually more of a military

15   type of bunk bed.

16       Q.    What do you mean by that?

17       A.    Not just like a slab of steel like more

18   of the connecting military bunk beds with the

19   springs in them.

20       Q.    How would you get to the top if there

21   was no ladder?

22       A.    How was that -- I am trying to think, I

23   don't know, climb up the frame of the bed.

24       Q.    Okay.  And when you say you climb up

1    the frame of the bed, would you have to step on

2    the bottom bunk in order to get to the top

3    bunk?

4        A.    Probably on the frame of the bed, I am

5    trying to think of that now.  The way the bed was

6    made you could climb up it.  They don't make them

7    any more.  You could go up the front of it, you

8    know, old Army bed, you know.

9        Q.    Did you make any complaints that they

10    didn't have ladders while you were there?

11        A.    No, I didn't.

12        Q.    How about at Barnstable while you were

13    incarcerated there, were you given a top bunk at

14    some point?

15        A.    The top, bottom, yes.

16        Q.    But at some point you were on the top

17    bunk while you were there?

18        A.    Yes, yes.

19        Q.    And there were ladders there?

20        A.    No, there were different types of beds,

21    again, it was military beds, you have to climb up

22    the frame.

23        Q.    Again by stepping on the lower bunk and

24    hoisting yourself up?

172

1          A.    By stepping on the frame there was a

2     bar there and another bar and you go hold onto

3     the bars to get up to the top.

4          Q.    And you have been incarcerated at

5     Concord, correct?

6          A.    Yes, I have.

7          Q.    And do they have ladders on their beds?

8          A.    No, they don't.

9          Q.    And you have been on the top bunk in

10    that facility -- while you were incarcerated at

11    Concord at some point?

12         A.    Let me see how they do that -- Concord

13    they have a locker -- you go from the locker to a

14    window up to the top.

15         Q.    But there are no ladders there either?

16         A.    No, there is no ladders there, no.

17         Q.    Did you make any complaints about the

18    fact that they didn't have any ladders?

19         A.    No.

20         Q.    And you were incarcerated in Shirley

21    obviously currently, not incarcerated by being

22    held in Shirley?

23         A.    Yes.

24         Q.    Are you assigned to a top or bottom

173

1    bunk?

2        A.    It is all single cells there.

3        Q.    It is single cells in Shirley?

4        A.    Yes, single cells which I am grateful

5    for.

6        Q.    You were in Bridgewater as well at some

7    point?

8        A.    Yes.

9        Q.    And was there more than one bed in the

10   cell there?

11       A.    Yes.

12       Q.    Were you assigned to the top or bottom

13   bunk when you were there?

14       A.    Top and bottom -- again it fluctuated

15   up and down depending on the classification of

16   the people and me.

17       Q.    And were there any ladders in those

18   beds?

19       A.    No.

20       Q.    Okay, and how did you get to the top

21   bunk?

22       A.    There was lockers there.  You could

23   stack the iron lockers one on top of the other

24   and made it easier.

174

1      Q.    But there was still no ladder for you
2   to access it?
3      A.    No, they put the locker on top of the
4   other locker.
5      Q.    Did you make any complaints there or
6   file any grievances with the fact that they
7   didn't have any ladders?
8      A.    No, I did not.  No, I did not.
9      Q.    At any of those facilities that we have
10  just spoken about -- did anyone at those
11  facilities instruct you how to get from the floor
12  to the top bunk?
13     A.    No, there wasn't a class or anything
14  that I took, no.
15     Q.    Did you ever fall as a result of going
16  up or down any of those -- in the last 20 years
17  prior to this incident -- have you ever fallen
18  while going up or down to a top bunk?
19     A.    No, no, no.
20     Q.    Have you ever written to any official
21  at the Suffolk County House of Correction about
22  the lack of ladders for you to get to the top
23  bunk?
24     A.    No.

175

1        Q.    Have you ever notified any officials at

2    the Suffolk County House of Correction that you

3    were afraid that you were going to fall as a

4    result of having to go up and down the bunks?

5        A.    No.

6        Q.    Okay.

7        A.    In general it is well known.

8        Q.    There is no question -- move to strike.

9        A.    Yes.

10       Q.    Do you contend that someone at the

11   House of Correction was aware of a potential

12   danger to you on February 3rd, 2003?

13       A.    I'm sure.

14       Q.    It can't be --

15       A.    I'm sure they were aware of it, yes.

16       Q.    What do you base your information on?

17       A.    Just the talk of the prison, different

18   people falling, hearing about this guy falling on

19   his way up, this guy the sink coming off the

20   wall, guys falling off the toilet, slipping off

21   the toilet.

22       Q.    Okay, who are these individuals?

23       A.    I don't know -- just in general.

24       Q.    Did you know any of this before your

### E N D O R S E M E N T

GOLDEN et al. v. COUNTY OF SUFFOLK
04-CV-10835-MEL

LASKER, D.J.

    Defendant moves to dismiss the segment of Count I
dealing with the specific issue of negligent failure to instruct.
The motion is DENIED.

    Plaintiffs claim that the County of Suffolk ("County")
was negligent for failing to protect those in its custody against
unreasonable risk of physical harm. Restatement (Second) of Torts
§ 314A (1965); see Slaven v. Salem, 386 Mass. 885 (1982).  The
County argues that it had no duty to warn of open and obvious
dangers.  See Barnett v. City of Lynn, 433 Mass. 662 (2001);
O'Sullivan v. Shaw, 431 Mass. 201 (2000); Greenslade v. Mohawk
Park, Inc., 59 Mass. App. Ct. 850 (2003).

    The County's arguments are unpersuasive.  Contrary to
the cases cited by Defendant, this case concerns a duty to
instruct Plaintiffs on a method of avoiding an obvious danger,
not simply to warn them of its presence.  Furthermore, the
plaintiffs in the cases cited by the Country were not required to
engage in the dangerous activity as a result of restrictions
placed on them by the defendants, which is the situation in the
case at bar.

    The complaint has sufficiently alleged the elements of
negligence on this matter.  Accordingly, the motion to dismiss on
the issue of negligent failure to instruct is DENIED.

    It is so ordered.

Dated:    June 29, 2005
          Boston, Massachusetts    __/s/ Morris E. Lasker__
                                       U.S.D.J.

